ROTHENBERG, J.
(concurring).
I concur with the majority opinion that this Court is bound by our recent decision in Geico Indemnity Co. v. Virtual Imaging Services, Inc., 79 So.3d 55 (Fla. 3d DCA 2011) (“Geico I”). I write separately to reiterate my disagreement with the panel opinion in Geico I, which I contend was wrongly decided.
This appeal arises from an action filed by Virtual Imaging Services, Inc. (“Virtual Imaging”), a provider of magnetic resonance imaging (“MRI”) services, against Geico General Insurance Company (“GEI-CO”) to recover additional personal injury protection (“PIP”) benefits. Virtual Imaging provided MRI services to Maria Tirado (“the insured”) under her GEICO automobile insurance policy for injuries she sustained in an automobile accident in 2008. Under an assignment of insurance benefits, Virtual Imaging billed GEICO $3,600 for its services (two MRIs).
The insured’s policy states: “[T]he Company will pay, in accordance with the Florida Motor Vehicle No-Fault Law, as amended, to or for the benefit of the injured person: (a) 80% of medical expenses .... ” (emphasis added). The term “Medical expenses” is defined in the policy as “reasonable expenses for medically necessary [services].” (emphasis added).
Relying on the fee schedule provided in section 627.736(5)(a)2.f., Florida Statutes (2008) (“the PIP fee schedule”), which states, “The insurer may limit reimbursement to 80 percent of the following schedule of maximum charges: ... 200 percent of the allowable amount under the participating physicians schedule of Medicare Part B,” GEICO reimbursed Virtual Imaging 80% of the 200% allowable under the Medicare Part B schedule. Under this formula, Virtual Imaging was reimbursed $1,987.57 (80% of $2,487.46), for its services to the insured, which was $892.42 less than 80% of the amounts Virtual Imaging charged.
Virtual Imaging filed suit against GEI-CO for the outstanding balance. The parties narrowed their positions to the legal *325 question at issue in this appeal, and filed cross-motions for summary judgment. The trial court, relying on State Farm Florida Insurance Co. v. Nichols, 21 So.3d 904 (Fla. 5th DCA 2009), determined that since the fee schedule in subsection (5)(a)2.f. is permissive, it is not “legally required,” and, therefore, not automatically incorporated into the policies by operation of law. Based on this reasoning, the trial court concluded the “plain language” of the policies controlled and entered final summary judgment in favor of Virtual Imaging.
We are bound by this Court’s decision in Geico I. In Geico I, the majority concluded the PIP statute provides two separate methodologies for the reimbursement of reasonable medical expenses and, because the language of subsection (5)(a)2. is permissive, the incorporation of subsection (5)(a)2. in the insureds’ policies creates an ambiguity which must be interpreted in favor of the insureds. I respectfully disagree.
THE PIP LAW
The 2008 version of Florida’s Motor Vehicle No-Fault statute, which governs and mirrors the language in the insured’s policy, mandates that PIP insurers “shall provide personal injury protection to the named insured ... [for] eighty percent of all reasonable expenses for medically necessary ... services,” up to $10,000. § 627.736(l)(a), Fla. Stat. (2008) (emphasis added). To avoid unnecessary litigation regarding the “reasonableness” of a medical charge, Florida’s Motor Vehicle No-Fault statute was amended in 2007 to include section 627.736(5)(a)2., which provides a reimbursement fee schedule for all PIP claims. The fee schedule found in section 627.736(5)(a)2.f., which is at issue in this appeal, provides, in pertinent part:
2. The insurer may limit reimbursement to 80 percent of the following schedule of maximum charges:
f. For all other medical services [including MRI services], supplies, and care, 200 percent of the allowable amount under the participating physicians schedule of Medicare Part B.
(emphasis added). The amended statute became effective on January 1, 2008,[5] and governs the insured’s policy. Because the insured’s policy went into effect after January 1, 2008, there is no issue regarding retroactive application of the reenacted, amended PIP statute to the insured’s policy-
PIP INSURERS MAY CALCULATE REIMBURSEMENT UTILIZING THE PIP FEE SCHEDULE WITHOUT SPECIFICALLY ELECTING TO DO SO IN THEIR POLICIES.
Virtual Imaging argues that by utilizing the reimbursement fee schedule, GEICO breached its contract because: (A) the insured’s policy makes “absolutely no reference to the new Medicare fee schedule;” and (B) an insurer may not rely on the fee schedule when reimbursing providers without including specific language in the policy stating that payment will be made pursuant to the PIP fee schedule. Essentially, Virtual Imaging contends, and the majority in Geico I held: (A) section 627.736(5) provides for two separate methodologies for reimbursement of medical costs: (1) payment of 80% of reasonable costs under subsection (5)(a)l.; or (2) payment of 80% of 200% of the allowable amount under the Medicare Part B schedule; and (B) the insurer must elect and specify which methodology it will use in the policy. I disagree.
*326 A. The fee schedule was incorporated by law into the insured’s policy.
Section 627.7407(2) states: “Any personal injury protection policy in effect on or after January 1, 2008, shall be deemed to incorporate the provisions of the Florida Motor Vehicle No-Fault Law, as revived and amended by this Act.” (emphasis added). It is uncontested that the insured’s policy was in effect on or after January 1, 2008. Further, the fee schedule provision is located squarely within the confínes of the Florida Motor Vehicle No-Fault Law. See § 627.730, Fla. Stat. (2008) (“Sections 627.730-627.7405 may be cited and known as the ‘Florida Motor Vehicle No-Fault Law.’ ”). Thus, the fee schedule was statutorily incorporated into the insured’s policy.
Additionally, in Grant v. State Farm Fire & Casualty Co., 638 So.2d 936, 938 (Fla.1994), the Florida Supreme Court specifically held that “where a contract of insurance is entered into on a matter surrounded by statutory limitations and requirements, the parties are presumed to have entered into such agreement with reference to the statute, and the statutory provisions become part of the contract.” (emphasis added) (citations omitted). The PIP fee schedule was therefore clearly incorporated by law into the insured’s policy.
B. The insured’s policy also specifically incorporates by reference Florida’s Motor Vehicle No-Fault Law, as amended.
“A document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties’ intent to be bound by its terms.” Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc., 743 So.2d 627, 631 (Fla. 1st DCA 1999); see also OBS Co. v. Pace Constr. Corp., 558 So.2d 404, 406 (Fla.1990) (“It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing.”). The ability to incorporate by reference applies equally to statutes. See Century Vill., Inc. v. Wellington E, F, K, L H, J, M, & G, Condo. Ass’n., 361 So.2d 128, 133 (Fla.1978). The insured’s policy states that reimbursements will be made “in accordance with, the Florida Motor Vehicle No-Fault Law, as amended.” (emphasis added). This language unequivocally evinces the parties’ intent to be bound by the terms of the Florida Motor Vehicle No-Fault Law, which includes the PIP fee schedule. Thus, it is clear that the fee schedule provided in subsection (5)(a)2.f. was incorporated by reference and became a part of the contract.
Consequently, the fact that GEICO’s policy does not make specific reference to the Medicare fee schedule is irrelevant. Requiring GEICO to amend its existing policies, or create new ones, to incorporate a fee schedule that is already incorporated by law and by reference into the insured’s policy is contrary to Florida law. See Northbrook Prop. & Cas. Ins. Co. v. R & J Crane Serv., Inc., 765 So.2d 836, 839 (Fla. 4th DCA 2000) (“Generally, all existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention.”) (citation omitted).

C.PIP insurers may utilize the fee schedule to calculate reimbursement without electing to do so in their policies.

Virtual Imaging’s argument that GEI-CO must “elect” to use the fee schedule in *327 the policy contravenes the plain language of the fee schedule. Section 627.736(5)(a)2. begins with the words: “The insurer may limit reimbursement to the following schedule of maximum charges.... ” This provision contains neither an election requirement nor any conditional language. The permissive words “insurer may” clearly show that this provision grants the insurer the unconditional, unilateral right to limit reimbursement according to the fee schedule, and does not provide for or contemplate any objection by an insured. It would therefore be a strained reading to conclude that an “election” must be made as a condition precedent to use of the fee schedule. “Where the wording of the Law is clear and amenable to a logical and reasonable interpretation, a court is without power to diverge from the intent of-the Legislature as expressed in the plain language of the Law.” United Auto. Ins. Co. v. Rodriguez, 808 So.2d 82, 85 (Fla.2001). Accordingly, I submit the PIP statute unambiguously permits PIP insurers to calculate reimbursement under the fee schedule without electing to do so in their policies.
Despite the PIP statute’s clear guidance, the majority in Geico I determined the PIP fee schedule’s functionality is “ambiguous.” “[W]hen a statute is unclear or ambiguous as to its meaning, the Court must resort to traditional rules of statutory construction in an effort to determine legislative intent.” Murray v. Mariner Health, 994 So.2d 1051, 1061 (Fla.2008). The majority in Geico I purported to resolve the ambiguity “in favor of the insureds” because the policies at issue were insurance contracts. However, the majority in Geico I failed to consider that interpreting PIP insurance policies to cover “the greatest amount possible within the language of the policies” adversely affects insureds by more rapidly depleting their $10,000 coverage limit. In reality, given the prohibition of “balance billing” in section 627.736(5)(a)(5),[6] interpreting PIP insurance policies in favor of the insureds actually requires reading the policies to cover the lowest amount possible.
In addition, a study of the legislative history, which is “the polestar that guides a court’s inquiry under the Florida No-Fault Law,” Rodriguez, 808 So.2d at 85, confirms that the interpretation of the majority in Geico I is at odds with the legislative intent behind the enactment of the fee schedule. Virtual Imaging argues, and the majority in Geico I held, that the PIP statute merely authorizes insurers to offer policies that limit reimbursement to the PIP fee schedule. Under this reading, some insurers would offer policies electing to limit reimbursement under the fee schedule while others would not. In this free market construct, some consumers would accept such a limitation, but others would seek out insurers who do not limit their reimbursements in this way. The fallacy in this interpretation is that it describes the situation as it existed prior to implementation of the PIP fee schedule, while the fee schedule was enacted to remedy the broken PIP reimbursement system.
Prior to the enactment of the fee schedule, the Florida Supreme Court in Holy Cross confirmed that PIP insurers were authorized to offer policies that limit reim *328 bursement to 80% of a contractually agreed-upon rate, stating:
First, there is no provision in ... the entire PIP statute that specifically precludes an insurer from entering into a contract with a provider to create an agreed-upon fee schedule for reduced rates. See [Nationwide Mut. Ins. Co. v.] Jewell, 862 So.2d [79], 83 [(Fla. 2007) ]. Second, payment at a reduced rate does not violate subsection (l)(a) so long as the insurer pays “eighty percent of all reasonable expenses.” § 627.736(1)(a), Fla. Stat. [ (2006) ] (emphasis supplied). What a provider customarily charges or has previously accepted are important factors for determining whether a fee is reasonable. See § 627.736(1)(a), Fla. Stat. ... Accordingly, “[i]f a provider has agreed in a valid and enforceable contract to accept payment for services at a particular rate, that rate would necessarily be a 'reasonable amount for the services ... rendered.’ ” Jewell, 862 So.2d at 86 (quoting § 627.736(5)(a), Fla. Stat.).
Holy Cross, 961 So.2d at 335 (emphasis added).
The “factors” for determining the reasonableness of a fee that the Court referenced are found in section 627.736(5)(a)1., which has been in effect since 2003:
With respect to a determination of whether a charge for a particular service, treatment, or otherwise is reasonable, consideration may be given to evidence of usual and customary charges and payments accepted by the provider involved in the dispute, and reimbursement levels in the community, and various federal and state medical fee schedules applicable to automobile and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service, treatment, or supply.
(emphasis added). The Florida Supreme Court’s opinion in Holy Cross clearly demonstrates that prior to the enactment of the fee schedule, insurers were authorized to offer policies that contractually limit reimbursement based on the factors outlined in subsection (5)(a)l., including “federal fee schedules” such as Medicare, and consumers were free to accept or reject them.
This, however, was the system the Florida Legislature found to be broken. Indeed, the legislative history is replete with evidence demonstrating that providers abused their calculation leverage, leading to widespread fraud and inflation of prices. Prior to the fee schedule’s enactment, when presented with an “unreasonable” bill, PIP insurers were often forced to pay the amount billed because their sole alternative was costly litigation. In September of 2000, Florida’s Fifteenth Statewide Grand Jury issued a report titled “Report on Insurance Fraud Related to Personal Injury Protection,” detailing the dilemma.[7] The report explained:
[A] number of greedy and unscrupulous legal and medical professionals have turned [the] $10,000 [PIP] coverage into their personal slush fund. Paying kickbacks for patients, abusing diagnostic tests, grossly inflating costs by engaging in sham transactions and filing fraudulent claims of injury, these individuals think nothing of enriching themselves by exploiting the misfortunes of others. The result is loss of coverage and marginal medical treatment for those who are injured, as well as higher insurance rates for all drivers.
*329 [[Image here]]
Because there is no fee schedule set by the government in PIP claims, and because of the strict rules regarding PIP claims, ... insurance companies must pay almost any amount billed. For example, a lumbar MRI scan would typically be billed on average at $1,700 to a PIP insurer. Medicare, however, would only pay $592 for that same test, a workers compensation carrier would only pay $546, and a typical preferred patient plan would on average pay $653.
(emphasis added). The grand jury concluded its report by recommending that the Florida Legislature “[c]onsider adopting a fee schedule for reimbursement under the PIP statute similar to the schedule employed in the worker’s compensation statute.”
In 2001, the Florida Legislature adopted the grand jury’s findings and enacted a fee schedule for a narrow class of PIP claims. See § 627.736(5)(b), Fla. Stat. (2001). Specifically, the Legislature stated:
The legislature finds that the Florida Motor Vehicle No-Fault Law is intended to deliver medically necessary and appropriate medical care quickly and without regard to fault, and without undue litigation or other associated costs. The legislature further finds that this intent has been frustrated at significant cost and harm to consumers by ... fraud, medically inappropriate over-utilization of treatments and diagnostic services, [and] inflated charges.... Many of these practices are described in the second interim report of the Fifteenth Statewide Grand Jury.... The Legislature ... adopts and incorporates in this section by reference as findings the entirety of the Grand Jury report.
Fla. SB 1092 (2001); Ch. 2001-271, § 1 Laws of Florida.
After several years, however, the Florida Legislature concluded that a fee schedule for only a narrow class of PIP claims was insufficient to drive down the costs of PIP. In a report commissioned in 2005 and prepared for the Florida Senate by the Committee on Banking and Insurance, the Committee found that “[p]remium rates for PIP increased significantly from 2002 to 2003,” and that this increase was attributable to an “increased amount paid for the average PIP claim.” Comm. on Banking & Ins., Florida’s Motor Vehicle No-Fault Law, Report No. 2006-102 at 62 (2005).
To remedy this problem, the Committee recommended that the Florida Legislature:
1. Reenact the no fault law,[8] provided that additional reforms are enacted to control costs, most importantly, a medical fee schedule as listed below.
2. Adopt a medical fee schedule for PIP, set at a specified percentage above the Medicare fee schedule. In addition to helping control PIP medical costs, a fee schedule would also reduce litigation over the reasonableness of medical fees and thereby reduce PIP loss adjustment expenses and attorney fee awards by insurers.
Id. at 96-97. In making this recommendation, the Committee cited New York,[9] New Jersey,[10] and Oregon[11] as states that have enacted PIP fee schedules to contain PIP costs. Id. at 64. Notably, each of these *330 fee schedules limits reimbursement of PIP charges to a specified maximum amount, and none of them contain an election requirement.
In 2007, based on the Committee’s report and recommendations, the Florida Legislature enacted a fee schedule for all PIP claims. See Ch. 2007-324, § 19, Laws of Fla. (2007) (stating that the reenactment of the No-Fault Law and the creation of the PIP fee schedule “was intended to be remedial and curative in nature”). Against a backdrop of widespread billing fraud, the PIP fee schedule was designed to curtail the calculation leverage historically wielded by providers by statutorily affording insurers the unilateral option of limiting reimbursement under a safe harbor schedule of maximum charges.
In sum, the Florida Supreme Court’s decision in Holy Cross demonstrates that prior to the enactment of the PIP fee schedule, insurers were authorized to do what the majority in Geico I concludes the PIP fee schedule authorizes them to now do. The Legislature, however, determined that the PIP reimbursement system as it previously existed was broken, and enacted the PIP fee schedule to cure the problem. Accepting Virtual Imaging’s interpretation, therefore, would render the statute superfluous. Because “[sjtatutory language is not to be assumed superfluous” and “a statute must be construed so as to give meaning to all words and phrases contained within that statute,” Terrinoni v. Westward Ho!, 418 So.2d 1143, 1146 (Fla. 1st DCA 1982), I respectfully submit that even if the PIP statute were ambiguous, the legislative history does not support the majority’s interpretation in Geico I.
SECTION 627.736 DOES NOT PROVIDE FOR TWO SEPARATE REIMBURSEMENT METHODOLOGIES.
The majority in Geico I concluded section 627.736 provides for two separate methodologies for reimbursement: (1) payment of 80% of all reasonable medical expenses under section 627.736(1)(a); and (2) payment of 80% of the fee schedule provided in section 627.736(5)(a)2. I respectfully disagree. There is only one reimbursement methodology under the PIP statute — insurers must reimburse the insured 80% of the reasonable medical expenses incurred. To satisfy the mandatory reimbursement requirement, subsection (5)(a)l. authorizes consideration of federal and state medical fee schedules in determining what is “reasonable”;[12] subsection (5)(a)2. identifies a particular fee schedule that the Legislature has concluded is reasonable; and payment under the fee schedule provided in subsection (5)(a)2. satisfies the PIP statute’s mandatory reimbursement requirement. Thus, there is only one methodology for reimbursement — payment of 80% of the reasonable medical expenses incurred.
THE POLICY DOES NOT PROVIDE FOR GREATER COVERAGE THAN THE PIP STATUTE.
Relying on Nichols and Kingsway Amigo Insurance Co. v. Ocean Health, Inc., 63 *331 So.3d 68 (Fla. 4th DCA 2011), Virtual Imaging contends the insured’s policy provides “greater coverage” than the PIP statute’s permissive reimbursement provision, and, therefore, the terms of the policy must control. However, because the insurance policy does not provide “greater coverage” than the PIP fee schedule, Nichols is inapplicable, and for the reasons that follow, I submit that Kingsway was incorrectly decided.
In Nichols, the Fifth District was confronted with a dispute between homeowners regarding the timing of reimbursement to insureds under Florida’s sinkhole insurance provisions. The insureds’ policies in Nichols required State Farm to submit payment to the insureds within sixty days of the filing of an appraisal award and State Farm’s receipt of proof of loss, while section 627.707(5)(b), Florida Statutes (2007), a permissive statute that was not mentioned in the insureds’ policies, enabled the insurer to withhold payment until the policyholder entered into a contract for repairs. Under the circumstances presented to the Nichols court, the insureds’ policies and the permissive statute required distinct performances — payment was due sooner under the policies than under the statute. The Fifth District concluded that because the language in the statute was permissive and not in conflict with the policy language, the policy was binding on the parties to the insurance contract. Id. at 904.
In Kingsway, the Fourth District was confronted with the same legal question at issue in the instant appeal. As in Nichols, the court in Kingsway determined the insureds’ policies, which mirror the PIP statute’s mandatory reimbursement requirement, and the permissive PIP fee schedule, provide two distinct payment methodologies, and payment under the policies would amount to greater coverage than under the PIP fee schedule. Kingsway, 63 So.3d at 67. Applying the logic of Nichols, the Fourth District held that when the insurance policy provides “greater coverage” than the amount required by a permissive statute not mentioned in the policies, the terms of the policy will control, and if the insurer wants to utilize the permissive fee schedule, it must clearly select that payment methodology. Id.
Interestingly, although the majority in Geico I cites to Kingsway, the majority opinion conflicts with Kingsway, and is decided on completely different grounds. Although both the majority in Geico I and the Fourth District conclude that the PIP statute provides for two different methodologies for reimbursement, the Fourth District concluded that the statute’s provisions are unambiguous, but because the insureds’ policies did not specify the payment methodology contained in subsection (5)(a)2., the insurer could not limit its reimbursement under this provision. Id. In contrast, the majority in Geico I concluded the statutes are ambiguous, and because “[ajmbiguities in insurance contracts are resolved in favor of the insured,” the insurer could not limit reimbursement to 80% of the fee schedule provided in subsection (5)(a)2. without electing to do so in the policy.
As to the issue of “greater coverage,” the majority in Geico I concluded that since the PIP fee schedule language is permissive, and because the coverage in the insureds’ policies provides broader coverage than the PIP fee schedule, the policy language should control. This interpretation is premised on the notion that the insureds’ policies and the PIP statute provide different reimbursement options. Specifically, the majority in Geico I states: “Geico was faced with at least two ways of reimbursing reasonable medical expenses: (a) reimbursing Virtual Imaging for 80% of *332 the amount billed, or (b) reimbursing them for 80% of 200% of the amount listed on the Medicare fee schedule.” This finding, however, incorrectly assumes the “amount billed” by providers is “reasonable.” Indeed, decades of widespread fraud and overbilling have proved that the amount providers bill is often far from reasonable. And under the majority’s interpretation, the recourse for insurers is litigation. As has already been established, however, the PIP statute, as amended, was intended to reduce litigation by circumscribing the calculation leverage historically abused by providers.
These insurance policies do not provide greater coverage than the fee schedule. The PIP statute mandates that all PIP insurers “shall provide personal injury protection to the named insured ... [for] eighty percent of all reasonable expenses for medically necessary ... services.” § 627.736(1)(a) (emphasis added). Because there are no exceptions listed in the statute, this reimbursement requirement is unequivocally mandatory across the board. Thus, any PIP reimbursement of less than 80% of reasonable medical expenses would be a statutory violation.
Reading the PIP fee schedule with reference to the PIP statute’s mandatory reimbursement requirement, it follows that the Legislature intended that all reimbursements under the PIP fee schedule must satisfy the mandatory reimbursement requirement. I therefore disagree with the majority’s conclusion in Geico I that it is “possible to conclude that there are simply two alternatives present in the policies: that Geico will either pay 80% of reasonable medical expenses, or that it will pay 80% of 200% of the maximum allowable amount under the fee schedule.” Construing the statute in such a manner creates an “absurd” situation where one of the statute’s provisions plainly violates another. Since “[statutes, as a rule, ‘will not be interpreted so as to yield an absurd result,’ ” State v. Iacovone, 660 So.2d 1371, 1373 (Fla.1995) (quoting Williams v. State, 492 So.2d 1051, 1054 (Fla.1986)), I disagree with Virtual Imaging’s contention that the PIP statute contains two conflicting payment methodologies. There is only one payment methodology under the PIP statute — payment of 80% of reasonable medical expenses — and payment under the PIP fee schedule has been legislatively determined to satisfy this requirement.
In sum, while the policies and statute in Nichols required distinct performances, namely the submission of payment at different times, in this appeal, the insured’s policy and the PIP fee schedule require the same performance — payment of 80% of reasonable medical expenses. Nichols is therefore inapplicable. Additionally, as is clear from the PIP statute’s mandatory reimbursement requirement, the PIP fee schedule outlines a safe harbor method for satisfying both the policy and statutory reimbursement requirements.

CONCLUSION

The PIP fee schedule was incorporated by law and by reference into the insureds’ policies. Consequently, the fact that GEI-CO did not specifically elect in the insured’s policy to calculate reimbursement according to the fee schedule is of no moment. Further, because the PIP statute mandates reimbursement of 80% of reasonable medical expenses in all PIP reimbursement cases, there can only be one reimbursement requirement under the PIP statute: payment of 80% of reasonable medical expenses. Thus, the PIP fee schedule must be construed as a safe harbor reimbursement method of satisfying the PIP statute’s mandatory reimbursement requirement.

*333
CERTIFICATION

I concur with the majority that the issue presented in this case is of great public importance. The Legislature amended the PIP statute to include the PIP fee schedule in an effort to reduce the fraud and enormous costs associated with PIP litigation. However, contrary to the Legislature’s intent, the issue presented here is being litigated in lawsuits across the state, with differing results. As an issue of great public importance, I submit that it should be resolved by our highest court.
SALTER, J., concurs.

. See Ch. 2007-324, § 21, Laws of Fla. (2007).

. Section 627.736(5)(a)(5) states:
If an insurer limits payment as authorized by subparagraph 2., the person providing such services, supplies, or care may not bill or attempt to collect from the insured any amount in excess of such limits, except for amounts that are not covered by the insured’s personal injury protection coverage due to the coinsurance amount or maximum policy benefits.

. This report is available at the Attorney General’s website at: http://myfloridalegal.com/ pages.nsf/Main/9ab243305303a0e085256cca 005b8e2e

. The No-Fault Law was scheduled to be automatically repealed on October 1, 2007. See Ch. 2003-411, § 19 Laws of Florida.

. N.Y Ins. Law § 5108(b).

. NJ.Rev.Stat. 39:6A-4.6 (2004).

. Or.Rev.Stat. § 742.525 (2004).

. Section 627.736(5)(a)1. states:
With respect to a determination of whether a charge for a particular service, treatment, or otherwise is reasonable, consideration may be given to evidence of usual and customary charges and payments accepted by the provider involved in the dispute, and reimbursement levels in the community and various federal and state medical fee schedules applicable to automobiles and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service, treatment, or supply.
(emphasis added).